**Steven M. RAYMAN and Springfield Properties Holding, Inc., Plaintiffs,**

v.

**The AMERICAN CHARTER FEDERAL SAVINGS & LOAN ASSOCIATION, now known as Metropolitan Federal Bank, FSB, Defendant.**

**No. 4:CV91–3319.**

United States District Court, D. Nebraska.

Nov. 9, 1994.

Rodney M. Confer, Knudsen, Berkheimer, Richardson & Endacott, Lincoln, NE, for plaintiffs.

Robert T. Grimit & Stephanie F. Stacy, Baylor, Evnen, Curtiss, Grimit & Witt, Lincoln, NE, for defendant.

## MEMORANDUM AND ORDER

KOPF, District Judge.

Two postjudgment motions have been presented to me.

First is the motion of the defendant (American Charter) for judgment as a matter of law, or to alter or amend the judgment, or for new trial (Filing 162). I shall grant the motion in part and deny it in part.

I shall grant the defendant's motion for judgment as a matter of law under Federal Rule of Civil Procedure 50, and alter and amend the judgment regarding the so-called "anti-tying" claims under Federal Rule of Civil Procedure 59, finding that the evidence, when viewed in the light most favorable to the jury verdict, provides no legally sufficient evidentiary basis for concluding that the anti-tying violations proximately caused the claimed damages. I shall deny the balance of the motion.

The result of this action is to let stand the jury's verdict on the contract claims and the related award of $726,180 in damages, (Filing 153, ¶¶ I, II), but overturn the jury's award of $726,180 in damages for the anti-tying claims. (*Id.*, ¶¶ III, IV.) In turn, granting the motion regarding the anti-tying violations requires me to set aside my prior decision to treble the damages and award attorney fees, which actions were solely predicated upon

the jury verdict on the anti-tying claims. (Filing 160).

The second motion (Filing 174) is submitted by one of the plaintiffs, Springfield Properties Holding, Inc. (SPH), seeking review of the refusal of the Clerk of the United States District Court for the District of Nebraska to tax court-reporter fees of $804.75 for a trial transcript. I shall grant this motion and award SPH $804.75 in additional costs.

### I.

Briefly summarized for the sake of clarity, the facts of this very complex case,[1] viewed most favorably to the jury verdict, are:

### A.

Steven M. Rayman (Rayman) was a sophisticated developer of apartment complexes. He was also very experienced in lending and borrowing money. At various times he owned substantial interests in savings and loan associations. He had a lot of experience with so-called "WRAP" mortgages, which will be discussed more fully later. He is and was worth a good deal of money. Rayman owned all of SPH.

American Charter is a federally chartered savings and loan association. It is and was a relatively large financial institution by Nebraska standards. It did not, however, have much experience with WRAP mortgages.

In September, 1985, Crest Mortgage Corporation (Crest) made two loans to an entity known as Springfield Partners (Partners). Partners was unrelated to any of the parties in this suit.

The two loans from Crest totaled $1,850,000. One of the loans, in the sum of $1,000,000, was collateralized by a "first mortgage"[2] on an apartment complex in Springfield, Missouri (the Project). The other loan was collateralized by a "second mortgage" on the Project.

---

1. Counsel for both sides did an admirable job of presenting this complex case to the jury. Both sides were represented by very able and experienced lawyers.

2. I use the term "mortgage" in the same short-hand manner in which the parties used the term

at trial. (*See, e.g.,* Filing 149, Instruction 6 (Statement of Undisputed Facts).) The "mortgages" in this case were actually deeds of trust, security agreements, and assignments of leases and rents.

The second mortgage was also a "WRAP" mortgage—it "wrapped around" the first mortgage. The amount secured by the WRAP mortgage was $1,850,000, with $850,000 being "new money," or money in addition to the $1,000,000 from the first-mortgage loan. Under the terms of the WRAP mortgage, Partners was obligated to make payments of $1,850,000, plus interest, to the holder of the WRAP mortgage, who, in turn, was required to remit part of the payments to the holder of the first mortgage. The borrower also remained obligated to make the payments on the first mortgage in accordance with the terms of that mortgage. Thus, at a given point in time, Partners owed Crest $1,850,000, secured by two mortgages on the Project, the second mortgage being a "WRAP" mortgage.

The benefit of this type of WRAP arrangement to a junior lien holder is that *if the documents so provide,* the WRAP holder has the opportunity, but not the obligation, to cure the defaults of the borrower. This right of "cure" saves the junior lien holder from being "foreclosed out" should the senior debt holder choose to foreclose its mortgage and sell the property in the event of default by the borrower. Thus, if the junior lien holder is satisfied that there is "equity" to protect (the debt to the senior lien holder is worth less than the value of the property to the junior lien holder), the junior lien holder can cure the default of the borrower, foreclose the WRAP mortgage and take possession of the property from the borrower, while forcing the senior lienholder to "stay in place."

The senior debt holder may or may not find such a WRAP arrangement acceptable given a variety of economic considerations. If, for example, the senior debt holder is well secured (the property is clearly worth more than the debt owed the senior lien holder), the senior lien holder may view the WRAP structure as simply another avenue of payment for its debt (recognizing that the junior lien holder has the right, but not the obligation, to cure defaults). From the viewpoint of the senior lien holder, one "down side" to this WRAP structure is that the junior lien holder can force the senior lien

holder to stay in the credit, despite default by the borrower, by curing the default of the borrower.

As long as both mortgages were held by Crest, there was no possibility of disagreement about which creditor had what rights because Crest held both the senior and junior debt and was receiving the mortgage payments directly. Later, however, both mortgages were sold by Crest. The first mortgage loan was sold to American Charter. Rayman later acquired ownership of the WRAP mortgage loan, which he subsequently transferred to SPH.

These matters were complicated by the fact that for a time Crest also serviced the first and second mortgages—that is, for a fee, Crest received payments from Partners on both mortgages and remitted the payments to the proper party. Rayman had a servicing agreement with Crest, and so did American Charter.

In an inter-creditor agreement, (Ex. 7), executed by American Charter and Crest, American Charter agreed, pursuant to paragraph 23, that it would not be an event of default under the first mortgage if the holder of the WRAP mortgage took title to the Project through foreclosure. The agreement did not, however, require American Charter to make a new loan to the WRAP holder. Nor did paragraph 23 require the WRAP holder to refinance the debt owed American Charter on the first mortgage in order to cure any defaults on the first mortgage.

The agreement, (Ex. 7), was entered into at time when Palm Beach Federal Savings Bank (Palm Beach), which was related to Crest, was the holder of the WRAP. Paragraph 23 of the inter-creditor agreement specifically stated that American Charter acknowledged the second-lien position of the WRAP mortgage then held by Palm Beach.

As noted, American Charter specifically agreed pursuant to paragraph 23 that if Palm Beach or an "affiliate"[3] took title to the property through foreclosure, such would not be an event of default under the first mortgage. Paragraph 19 of this agreement made

---

**3.** Rayman owned substantial equity interests in both Crest and Palm Beach at various times.

the inter-creditor agreement binding upon the successors and assigns of the parties.

Palm Beach later assigned to Rayman all of its rights "given to evidence or secure, or otherwise relating to, the indebtedness or the transactions described in the above-referenced Wrap–Around Promissory Note and other documents." (Ex. 23, ¶ 4.) American Charter specifically acknowledged and agreed to the assignment of Palm Beach's interests to Rayman. (Ex. 9.) Thus, Rayman, and later SPH, stood in the shoes of Crest and Palm Beach and had whatever rights those entities would have had pursuant to paragraph 23 of the inter-creditor agreement.

I found the inter-creditor agreement ambiguous as to whether paragraph 23 permitted the WRAP holder to cure a default by the borrower on the first mortgage, although the agreement seemed to suggest as much since it provided that foreclosure of the WRAP mortgage would not be an event of default on the first mortgage. In light of this ambiguity, I admitted parol evidence to construe paragraph 23.

The assistant vice president of American Charter who signed the inter-creditor agreement agreed with the plaintiffs that it was the intention of the parties to allow a cure by the WRAP holder. Accordingly, since there was no factual dispute as to what American Charter intended by the provisions of paragraph 23 of Exhibit 7, there was nothing to submit to the jury as a matter of fact regarding the meaning of the agreement. The plaintiffs wholeheartedly agreed with the interpretation given the agreement by the American Charter vice president who signed it.

Consequently, I instructed the jury, (*see, e.g.,* Filing 149, Instruction 7, at 2), that the holder of the WRAP mortgage (read in light of the inter-creditor agreement and the first mortgage) was *contractually entitled to cure a monetary default on the first mortgage* and American Charter was contractually bound to accept the cure—provided that the cure was timely—before acceleration of the entire amount due on the first mortgage.

In late May, 1990, Crest notified Rayman and American Charter that it was terminating its servicing agreements. It is at that point that Rayman (and later his holding company, SPH) and American Charter became real adversaries.

## B.

The plaintiffs' first theory of recovery was for a breach of the "anti-tying" provisions of the Home Owners' Loan Act (HOLA). 12 U.S.C. § 1464(q). *See also* 12 U.S.C. § 1971, *et seq.*

Rayman testified that in late May and June, 1990, American Charter, holding monies owed on the WRAP mortgage, violated 12 U.S.C. § 1464(q)(1)(A) in that it conditioned the return of money paid by Partners in exchange for Rayman agreeing to allow American Charter to service the WRAP mortgage for a fee. Rayman also testified that American Charter demanded that Rayman release his rights under paragraph 23 of the inter-creditor agreement. Rayman testified that he agreed to allow American Charter to service the WRAP mortgage for a fee, but he did not give up his rights under paragraph 23 of the inter-creditor agreement.

## C.

The second theory of recovery involved the plaintiffs' first breach-of-contract theory. It was undisputed that Partners defaulted on the payments owed American Charter on the first mortgage in June and July, 1990. Partners also defaulted on the WRAP payments. When Rayman learned of the default, he (as the current holder of the WRAP mortgage) caused to be tendered to American Charter on July 18, 1991, an amount he believed would cure the monetary defaults of Partners on the first mortgage. At trial, American Charter admitted that it received and refused the tender from Rayman.

## D.

The third theory of recovery involved the second claim of breach of contract. It is virtually identical to the first breach-of-contract claim.

Rayman testified that he completed fore-closure of the WRAP mortgage on August 5, 1991, when his holding company, SPH, took title to the Project. On that date, SPH tendered to American Charter an amount it believed would cure the defaults on the first mortgage. American Charter admitted that it received and refused the tender.

### E.

The fourth theory of recovery involved the second "anti-tying" claim. When American Charter refused the tender of August 5, 1991, negotiations began between Rayman and SPH and American Charter. On August 7, 1991, the parties entered into an agreement wherein they agreed to "stand still" until one of the parties terminated the agreement.

On August 13, 1991, American Charter offered to allow Rayman (or SPH) the opportunity to assume the first mortgage in exchange for mutual releases of liability. This offer, if accepted, would have caused Rayman to release his claims relating to American Charter's alleged breach of contract arising out of its unwillingness to accept the cures. It also would have required Rayman to give up his rights under paragraph 23 of the inter-creditor agreement and would have forced him to assume the obligations of the borrower. Rayman did not respond to this offer, and it was undisputed that he never accepted the offer. It is this offer that SPH and Rayman contended violated the provisions of the anti-tying statute. 12 U.S.C. § 1464(q).

### F.

Rayman testified that soon after American Charter's refusal to accept the first tendered cure on July 18, 1991, he began seeking a buyer for the Project and began foreclosing the WRAP mortgage. He said he did this because he feared that American Charter, having refused a cure of the default, would foreclose its first mortgage and conceivably wipe out his "equity" in the project or, at the very least, force him to use his own money to pay off American Charter in order to protect his equity in the Project. Rayman was willing to cure the defaults, but he did not want to be forced to pay the entire amount of the American Charter loan at one time.

On September 4, 1991, SPH entered into an agreement to sell the property. On September 18, 1991, American Charter was notified of the sale and provided a loan pay-off figure for its first mortgage. The sale closed on September 30, 1991. From the sale proceeds of $1,750,000, SPH paid American Charter in full and kept the balance.

The damage claim for all four theories of recovery was the same. SPH[4] claimed damages arising out of each theory of recovery in the same amount—$726,180—and for the same event—forced sale of the property to avoid an American Charter foreclosure, thereby depriving the plaintiffs of the opportunity to hold the property to the maturity date of American Charter's loan.

This damage formulation proceeded on the theory that had SPH held the Project for three years until the maturity of the American Charter loan, SPH would have sold the property on the maturity date of the American Charter loan and realized the benefit of its bargain.

These damages were based upon an independent "MAI"[5] appraisal done in 1991 for the lending institution and the person who bought the Project from SPH and the testimony of Rayman's in-house financial analyst, Mr. Feldman. Feldman, who was related to Rayman by marriage, had worked in Rayman's businesses for about 22 years and was one semester short of graduating from the Wharton School of Business and Finance.

Feldman testified that, based upon the MAI appraisal, the Project had a fair market

---

4. I ruled as a matter of law that only SPH could assert the claims because Rayman had transferred his rights to his holding company, SPH, at the time the damages were sustained. Thus, at the conclusion of the trial, I granted the defendant's motion for judgment as a matter of law as against Rayman.

5. An appraiser who holds an "MAI" (Member of Appraisal Institute) certificate is recognized as highly qualified.

value of $1,938,000 on the date of sale in 1991, that the property would have appreciated, conservatively, 3 percent per annum such that it would have been worth approximately $2,117,000 on the maturity date of the American Charter loan, and that Rayman would have enjoyed positive cash flow (profits) of $359,000 during this three-year period.

Thus, the gross benefit of the bargain to Rayman (and SPH) was approximately $2,476,000 ($2,117,000 plus $359,000) had the property been held to maturity. The net benefit of the plaintiffs' bargain was said to be $1,476,000 ($2,476,000 gross benefit less $1,000,000 owed to American Charter) had the property been held to maturity.

When the property was sold in 1991, Rayman "netted" about $750,000 after American Charter was paid. Thus, the difference between what Rayman and SPH would have earned had they kept the property to maturity of the American Charter loan and what they earned when they sold the property under alleged threat of foreclosure was approximately $726,000 ($1,476,000 net benefit if held to 1994, less $750,000 realized at sale in 1991).

The evidence reflects that Rayman managed, owned or financed numerous apartment complexes throughout the nation. Feldman testified that he was himself an investor and a real estate investment analyst with over 20 years' experience in owning, operating and managing similar apartment projects. The evidence further reveals that the Project had a long operating history under its previous management, was well maintained and was nearly 100 percent leased by August, 1991.

The jury was instructed on all theories of recovery in essentially the same manner. The jury was told that SPH was entitled to recover the market value of the property at the time the property was sold plus the reasonable value of the net gains and profits SPH was denied as a result of American Charter's conduct *less* the money received from the sale of the property. (Filing 149, Instructions 13, 14.)

The jury was also instructed on mitigation of damages. Among other things, the jury was instructed, without objection by American Charter, that the "defendant is not liable for any damages that could reasonably have been prevented if the plaintiffs had done so. The defendant has the burden of proving that the plaintiffs failed to take reasonable steps to minimize their damages." (Filing 149, Instruction 12.) In that same instruction, the jury was instructed that the plaintiffs were not required to accept the defendant's offer to provide alternative financing conditioned upon the plaintiffs' willingness to provide a release of liability. (*Id.*)

### G.

The jury returned a verdict in favor of SPH on all four theories of recovery in the amount of $726,180. (Filing 153.) This sum was trebled pursuant to the statute, attorney fees were awarded, and judgment was entered for SPH. (Filings 160, 161.) The timely postjudgment motion of American Charter followed in due course. American Charter made all the trial motions necessary to preserve its right to file postjudgment motions.

### II.

Save for one point, I shall deny American Charter's postjudgment motion. In so doing, I carefully examined each and every argument advanced by American Charter and found all but one unavailing.

I examined the positions of the parties with the understanding that: (1) I must not grant the Rule 50 motion unless all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the nonmoving party, *see, e.g., Brown v. Syntex Lab., Inc.,* 755 F.2d 668, 671 (8th Cir.1985); (2) the decision to grant or deny a motion to amend judgment under Federal Rule of Civil Procedure 59 is in the sound discretion of the trial court, *A.W. v. Northwest R–1 Sch. Dist.,* 813 F.2d 158, 165 (8th Cir.1987), *cert. denied,* 484 U.S. 847, 108 S.Ct. 144, 98 L.Ed.2d 100 (1987); (3) where the motion for a new trial under Rule 59 is predicated on the claim that the verdict is against the weight of the evidence, the motion should be granted only if the verdict is against the great, clear or overwhelming

weight of the evidence, and the court may weigh the evidence, disbelieve witnesses and grant a new trial even when there is substantial evidence to sustain the verdict; however, the district court may not reweigh evidence and set aside the verdict merely because the jury could have drawn different conclusions or inferences or because other results are more reasonable, *White v. Pence,* 961 F.2d 776, 779–80 (8th Cir.1992); *Frumkin v. Mayo Clinic,* 965 F.2d 620, 624 (8th Cir. 1992); and (4) a verdict on damages should not be set aside as "excessive" on a Rule 59 motion for new trial unless the result is "monstrous" or "shocking," *see, e.g., Stafford v. Neurological Medicine, Inc.,* 811 F.2d 470, 475 (8th Cir.1987), recognizing that the law does not require mathematical precision in proof of loss, *see, e.g., School Dist. No. 11 v. Sverdrup & Parcel & Assocs., Inc.,* 797 F.2d 651, 654 (8th Cir.1986). I have applied these standards to this case.

### A.

Although I have examined each reason urged for granting American Charter's motion and found each wanting, three of the arguments nevertheless merit discussion.

### 1.

■ .American Charter argues that relief is appropriate because the availability of alternative financing and the plaintiffs' failure to seek refinancing invalidate the damage theory. I disagree.

Much of American Charter's argument is premised on the theory that the "contract" American Charter breached was a contract to loan money. Consequently, American Charter argues that there was no damage to the plaintiffs since they could have replaced the financing they lost with alternative financing.

American Charter's premise is wrong, however. "Lending money" to Rayman or SPH (and the concomitant financial obligations to the plaintiffs) was clearly not what the contract directed. Rayman and SPH were creditors just like American Charter. Rayman, and later SPH, had contractual rights as creditors to cure defaults of the borrower regarding American Charter's first mortgage so they could take possession of and maintain an asset that would produce profit and capital gain if it were held to the maturity of the first lien.

As WRAP holders, the plaintiffs were not in the business of borrowing money; they were in the business of lending money, just like American Charter, and taking over the property if the debtor defaulted. The plaintiffs were contractually entitled to the benefit of the bargain with American Charter, which benefit included the right to foreclose the WRAP, take title to the Project, cure any defaults on the first mortgage, and realize the rewards of those efforts at the maturity of the American Charter loan.

Alternative financing has little or no relevance to the benefit-of-the-bargain measure of damages except to the extent it pertains to the affirmative defense of mitigation. The jury was properly instructed on mitigation, and American Charter did not object to the mitigation instruction. Rayman's explanation of his business decision to sell the property, rather than attempt to refinance it or inject his own cash, was certainly sufficiently reasonable, if believed by the jury, to support the jury's verdict, particularly given the fact that American Charter had the burden of proof on mitigation.[6]

### 2.

American Charter also argues that the damage analysis advanced by Feldman, the

---

6. Rayman had a number of reasons for not seeking refinancing. For example, he did not want to sign a personal guaranty (which would have dramatically increased the economic risk), and he thought it likely that another lender would require such a guaranty given the troubled status of the loan; he doubted he could obtain a short-term loan (American Charter's loan matured in three years), and he did not want to hold the Project beyond that term as that was the extent of the risk he had contracted for; he doubted he could convince another lender to make a loan given American Charter's unwillingness to stay with the credit despite Rayman's attempts to cure the borrower's default; and although able, he was unwilling to inject his own cash to pay off American Charter's loan because he did not think such an investment of his own cash made sense given his business plans. It was for the jury to evaluate whether these factors were reasonable, and American Charter had the burden of proving the plaintiffs' acts or failures to act in mitigation were unreasonable.

plaintiffs' in-house financial analyst, "double counted" because it included both the value of loss of future cash flow (profit) and potential appreciation (gain). I do not agree.

 It must be remembered that the plaintiffs were entitled to profits and gains that would have occurred had the plaintiffs held the property to the maturity of the American Charter loan since that was the benefit of the bargain. Feldman's analysis properly examined two particular points in time: (1) what the plaintiffs would have earned when they operated the Project between 1991 and 1994, and (2) what the plaintiffs would have realized when they sold the Project in 1994 when the American Charter loan matured.

Simplified, Feldman's analysis asked the question: What would Rayman have enjoyed if he (or SPH) had held the property to the maturity date of American Charter's mortgage? Feldman answered that question by examining two points in time.[7]

 First, Feldman testified that the plaintiffs would have received net positive cash flow (profit) of approximately $359,000 from 1991 through the maturity date of the American Charter loan. (Tr. 660:11–16.) Roughly speaking, this was net operating profit (not to be confused with net operating income); that is, profit received from opera-

tions of the Project during the period of the American Charter loan. It must be remembered that this figure was *not* what the Project would have been worth when the American Charter loan came due in 1994; rather, it was the profit the Project would have produced between 1991 and 1994.

 The "profits" ($359,000) were calculated in a two-step process. Feldman determined a yearly figure for rent received less expenses of operation, but before payment of debt service; the product of this calculation is sometimes called net operating income or NOI. (*Id.* at 646:17–647:12).[8] An NOI figure was determined for each year based upon projections that Feldman had found to be historically sound in the apartment business, from limited historical data Feldman had acquired from operating the Project in August and September, 1991, and from the MAI appraisal. From yearly NOI was then subtracted the yearly debt service that would have been paid to American Charter. (*Id.* at 654:4–8 (1991–92); 659:8–14 (1992–93); 660:11–18 (1993–94).) Thus, for each year a "profit" was calculated by calculating NOI and then subtracting debt service from NOI, and when the yearly "profits" were added together for the remaining life of the American Charter loan, the "profits" totaled $359,-000.[9]

---

**7.** For the direct testimony of Feldman, see the trial transcript at pp. 619–666.

**8.** This was necessary because Feldman would also use the NOI calculation when endeavoring to determine what the property would be worth in 1994.

**9.** To the extent that American Charter really argues there was no "foundation" for the projection of lost profits, American Charter's argument fails. For example, while Rayman and SPH did not have a long history of operating the Project, the Project had long been operated by others. The 1991 appraisal, (Ex. 22), was prepared for the purchaser who bought the Project from SPH and the lender that financed the sale. It contained operational information, including income and expense projections. Although a complete operating history was not available to the appraiser, he was able to project fixed and operating expenses from "a review of several other actual operations as well as from current actual expenses." (Ex. 22, at 60.) The appraiser had historical data on the vacancy rates of the Project. (*Id.*) The appraiser felt that his income

approach to valuation was the most accurate of three methods he used to appraise the property. (Ex. 22, at 80.) Feldman specifically testified that he compared the operating income projected in the 1991 appraisal and in fact used the operating income projection in the 1991 appraisal to confirm his own profit analysis. (Tr. 652:8–653:10.) Furthermore, when SPH took over the property, Feldman "put together the records" that "showed what ... tenant was in each unit and what their monthly payments were supposed to be." (*Id.* at 645.) Moreover, the plaintiffs had a long history of operating between 4,500 and 10,000 apartments nationwide, (Tr. 621:1–3), using a home-office staff of 30 people and a total staff of between 300–400 people. (*Id.* at 621:19–22.) Feldman testified that he kept very precise historical information on the experiences of the Rayman enterprises, (*id.* at 622:1–25; 625:1–13; 646:1–12 & 17–25), and that he had done income projections for 20 years, analyzing "thousands" of similar properties. (*Id.* at 626:22–627:15.) While the jury was not obligated to believe Feldman's analysis, there was certainly a sufficient foundational basis for Feldman

Second, Feldman testified that an investor who observed an asset that would produce a positive net cash flow (profit) of $359,000 over three years would be willing to pay something for that asset. Feldman testified, and the 1991 MAI appraisal tended to confirm his testimony, that investors are willing to pay approximately 10 times yearly NOI (not to be confused with the profit, which is determined by subtracting debt service from NOI) for an asset that will produce profits of the kind estimated by Feldman. (*Id.* at 661:2–662:7.)

Accordingly, Feldman took the projected NOI of $213,654 for the last year of the American Charter loan, (*id.* at 660:4–6), and applied a 10 percent capitalization rate. This multiplication produced a value for the property at the maturity date of the American Charter loan of approximately $2,136,000. (*Id.* at 662:13.)

However, capitalization rates are obviously only approximations of what someone will pay for an asset that produces a net income stream (the chance to earn profits). Feldman recognized that the 1991 appraisal established the value of the property *in 1991* at $1,938,000. If Feldman used this estimate of value in 1991 as a starting point and only increased the value of the property by what he thought was a very conservative 3 percent per year, that approach indicated the property would be worth $2,117,000 in 1994, which was only slightly less than the value generated by use of the capitalization rate. (*Id.* at 661:2–662:21.) This comparison served as a check on the use of the capitalization rate. Feldman chose the more conservative of the two numbers ($2,117,000 vs. $2,136,000) to establish what the property would have been worth in 1994, although there was no material difference in the results. (*Id.* at 662:11–21.)

Thus, it was Feldman's opinion that what the plaintiffs suffered by way of damages was (1) the loss of "profits" ($359,000) from the positive net cash flow that would have occurred between 1991 and 1994 had the property been held to maturity of the American Charter loan, and (2) the loss of the appreciation (gain) ($367,000) in the value of the property that would have occurred in 1994 if the property had been held to the maturity of the American Charter loan and then sold ($2,117,000 value in 1994 less actual sale price of $1,750,000 in 1991 equals $367,000). The total of these two numbers ($359,000 and $367,00) is $726,000.[10]

There is nothing duplicative about this analysis. One part of the analysis deals with the operating profits the plaintiffs would have earned had they operated the Project between 1991 and 1994, and the second part of the analysis deals with the gain the plaintiffs would have realized when they sold the property (after operating it) in 1994 at the maturity date of the American Charter loan. Moreover, this theory was perfectly consistent with the jury instructions on damages. While the jury was not obligated to believe Feldman, there was nothing unreasonable or duplicative in his analysis.

**3.**

■ American Charter argues that the "second tie" was not actionable since it was no more than an "attempt" that did not bear fruit because Rayman did not accept American Charter's proposal ("tie") to assume the mortgage in exchange for a release of right to cure the defaults of the borrower. I disagree with American Charter's argument for four reasons.

■ First, conceptually, so long as the plaintiff is a "customer" of the bank,[11] there is no reason to limit the anti-tying statute to illegal "ties" that are implemented rather than attempted, assuming such attempted "ties" proximately cause the customer damage. An "attempt" can cause a bank custom-

to testify about lost profits without undue speculation.

**10.** The actual jury award was $726,180. The slight difference between the two numbers exists because I used round numbers for the sake of clarity.

**11.** The jury could have found that Rayman (and later SPH) were "customers" of American Charter. For example, the evidence revealed that for a fee American Charter was servicing the WRAP mortgage held by Rayman (and later SPH) when American Charter made the proposal that gave rise to the attempted "tie."

er harm that is similar to the harm caused by an actual "tie." And an "attempted tie" involves essentially the same vice as an actual "tie"—misuse of market power over a bank customer.

Second, nothing in the plain words of the statute clearly indicates that its provisions are limited only to implemented "ties." Indeed, the statute can be read to suggest that attempted "ties" are actionable: "Any person may sue for and have injunctive relief ... against *threatened* loss or damage by reason of a violation of paragraph (1)...." 12 U.S.C. § 1464(q)(2)(A) (emphasis added).

Third, the case law, while not abundant or always clear, seems to suggest that an "attempt" can violate the statute. *See, e.g., Integon Life Ins. Corp. v. Browning*, 989 F.2d 1143, 1152 (11th Cir.1993) (discussing *Amerifirst Properties, Inc. v. FDIC*, 880 F.2d 821 (5th Cir.1989), and *Swerdloff v. Miami Nat'l Bank*, 584 F.2d 54 (5th Cir. 1978), and concluding that "[i]n both cases, the Fifth Circuit held that when a bank *attempts* to create an illegal tying arrangement and then refuses to provide the tying or desirable product to the customer *because the customer will not* or cannot comply with the condition of the tie, the bank may be held liable under the BHCA [Bank Holding Company Act].") (emphasis added).[12]

Fourth, American Charter has cited no case holding that the anti-tying statute does not reach attempts. Specifically, while American Charter relies upon language from cases like *Alpine Elec. Co. v. Union Bank*, 979 F.2d 133, 135 (8th Cir.1992), American Charter candidly acknowledges that "these courts did not decide the cases before them on the issue of an attempted tie...." (Mem. Supp.PostJ.Mots. at 46–47.)

Accordingly, I am *not* persuaded by American Charter's argument that the anti-tying statute does not reach an attempted tie.

**B.**

Lastly, I shall discuss the one argument asserted by American Charter that I find persuasive. American Charter argues that even if one believes all the evidence adduced by the plaintiffs, the damages claimed by SPH were nevertheless not proximately caused by the anti-tying violations. After very careful consideration, I find that I agree with American Charter.

Essentially, I find that American Charter's breach of contract in refusing to accept the cures tendered by the plaintiffs caused SPH to foreclose the WRAP, take control of the Project and sell the Project, thereby damaging SPH. I find that the sale of the Project was the cause of the damages suffered by SPH. I further find that SPH incurred this damage because it feared foreclosure by American Charter, which fear was created by American Charter's wrongful refusal to accept the plaintiffs' tendered cures of default. I then find that such damages were not a direct consequence of the tying violations because: (1) such damages would have occurred whether or not the alleged "ties" took place, and (2) to the extent such "ties" contributed at all to the fear that caused the damages, the connection between the "ties" and the damages was so attenuated as to be only an indirect, rather than a direct, cause of the damages. Finally, and without intending the slightest criticism of the jury which gave this very complex case serious consideration, I find that no reasonable finder of fact could conclude on the evidence presented in this case that the "ties" were the proximate cause of the damages, giving SPH the benefit of every reasonable (but no unreasonable) inference.

I shall therefore grant the Rule 50 motion for judgment as a matter of law, alter and amend the previously issued judgment pursuant to Rule 59, and enter judgment accordingly. My reasoning is set forth in the following portions of this memorandum.

**1.**

I first observe that there is no disagreement that SPH was required to prove "proximate cause" and there is no disagreement that "proximate cause" means, in this con-

---

**12.** The Bank Holding Company Act contains provisions similar to 12 U.S.C. § 1464. *See* 12 U.S.C. § 1972.

text, that the anti-tying damages must have been a "direct consequence" of the anti-tying violations.

American Charter contends, and SPH does not (now) dispute, that SPH was obligated to prove the anti-tying violations "proximately caused" the damages the jury awarded for violation of the anti-tying statute. (Pls.' Mem.Opp'n PostJ.Mots. at 28–29 ("Springfield proved and the jury found that American Charter's tying activities were the proximate cause of the damages....").)[13]

I instructed the jury that in order to recover under the anti-tying claims SPH was obligated to prove the violations were a "proximate cause" of damage. (Filing 149, Instruction 9, pt. I ¶ B(4) & pt. II ¶ B(4).) I also instructed the jury that "proximate cause" meant that "the act or omission played *a substantial part* in bringing about or actually causing the injury or damage, and that the injury or damage was either *a direct result or a reasonably probable consequence* of the act or omission." (Filing 149, Instruction 11 (emphasis added).)

SPH does not now challenge my definition of proximate cause in Instruction 11. Rather, SPH appears to agree in its memorandum that "but for" or "direct" causation was appropriately required. (Pls.' Mem.Opp'n PostJ.Mots at 29–30 (" 'But for' the first tie, Rayman would not have been damaged.... In the same vein, 'but for' the second tie, Springfield would not have been damaged.").)

■ American Charter argues, and I agree as evidenced by Instruction 11, that

damages for anti-tying violations must be shown to be a "direct consequence" of the tying activity. *See, e.g., Campbell v. Wells Fargo Bank, N.A.,* 781 F.2d 440, 443 (5th Cir.), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986) (dismissal of tying claim under Bank Holding Company Act was appropriate because alleged damages were not "direct consequence of the defendants' activities"). *See also Sundance Land Corp. v. Community First Fed. Sav. & Loan Ass'n,* 840 F.2d 653, 660 (9th Cir.1988) (favorably quoting the "direct consequence" requirement of *Campbell* ). I note that *Sundance* is also cited and quoted as authority for SPH's position. (Pls.' Mem.Opp'n PostJ. Mots. at 29–31.)

■ Having concluded that SPH was obligated to prove its damages were a "direct consequence" of the anti-tying violations, I next examine each of the alleged anti-tying violations.[14]

### 2.

■ The first illegal "tie" occurred when American Charter, having obtained monies rightfully owed to the WRAP holder, "tied" release of those funds to an agreement that Rayman would allow American Charter to service the loans on the Project for a fee. This "tie" took place in May or June, 1990, long before SPH foreclosed the WRAP mortgage in August, 1991, took possession of the property, and sold it in September, 1991.

It is undisputed that the cause of the damage to SPH was the sale of the Project. It is

---

**13.** During trial, at the jury-instruction conference, counsel for SPH argued that causation was "relaxed" under HOLA for the anti-tying violations and that this relaxed standard should be applied "rather than simply a statement of proximate cause." (Tr. 1021:1–3 & 6–7.) Counsel's argument for a "relaxed" causation instruction may have implicitly reflected a realization of the weakness of SPH's causation theory as it regards "proximate cause" and the anti-tying violations.

**14.** In so finding, I recognize that there can be more than one cause that combine to "proximately cause" damage. Nevertheless, the "actionable cause or causes" (the cause or causes offered by a plaintiff) must directly contribute to the damage in order for there to be sufficient "proximate cause." *Compare* 3 Hon. Edward J. Devitt et al., *Federal Jury Practice and Instruc-*

*tions* § 80.18, at 170–74 (1987) (definition of "proximate cause" used in this case) (*Federal Jury Practice and Instructions* ) with *Federal Jury Practice and Instructions* § 80.19, at 174–75 (instruction relating to "More Than One Proximate Cause"). This is only to state that a "cause" relied upon by the plaintiff must be sufficiently "substantial" that it may reasonably be said to be "a," if not "the," "proximate cause." *See, e.g.,* W. Page Keeton et al., *Prosser and Keeton on Torts* § 41, at 266–68 (5th ed. 1984). For example, a person who throws a match into a forest fire "causes" fire damage, but not in a "substantial" way, and thus the act of throwing a match into the forest fire would not be a "proximate cause" of the damage caused by the fire. *Id.* at 268.

also undisputed that SPH sold the Project because it feared foreclosure by American Charter. The first "tie" has little or no relationship to the fear that motivated the sale.

The plaintiffs argue that the first "tie" was a proximate cause of the fear that motivated the sale because had the "tie" not existed, Rayman would have serviced the loans on the Project, and when the borrower defaulted, Rayman would have cured the default. However, the ability or inability to cure the default turned not on who serviced the loans, but on American Charter's view that Rayman did not have the legal right to make a cure for a third party, regardless of who serviced the loans. There is no basis in the evidence to conclude that American Charter would have taken a different position had Rayman serviced the mortgages.

As a consequence, if one assumes that everything in this case happened as suggested by the plaintiffs with the exception of the first "tie," it follows that the damage would have occurred in precisely the same way. That is to say, there would still have been a default, Rayman would still have tendered the cures, American Charter would still have refused the tenders, the plaintiffs would still have feared an American Charter foreclosure, and SPH would still have sold the Project. Moreover, adding the "first tie" to this scenario does not make the likelihood of damage substantially greater.

I note that I found as a matter of law that a timely cure was one that was made before acceleration. (Filing 149, Instruction 7, pt. I ¶ A at 2 & pt. II ¶ A at 5.) The evidence was undisputed that the cures were made before acceleration. Thus, since the tenders were timely, the plaintiffs cannot contend that the first "tie" was a proximate cause of the damage because Rayman was somehow delayed in making timely tenders by the failure of American Charter as loan "servicer" to notify Rayman of default.

I also note that it is unreasonable to assume that American Charter would *not* have known of the default by the borrower if Rayman serviced the loan and would therefore have blindly accepted Rayman's money.

This assumption is unreasonable for two reasons.

Since Rayman became aware of the default even though he did not service the loan, it is unreasonable to assume that American Charter would not have known of the default if the roles were simply reversed. More fundamentally, such an assumption is entirely speculative as the undisputed evidence is that American Charter was aware of the default. Thus, there is no rational way to draw an inference that American Charter would have been ignorant of the default absent the "tie" without piling assumptions upon assumptions.

In summary, the ability or inability to cure the borrower's default on the first mortgage is something wholly determined by American Charter's wrongful interpretation of the "cure" provisions of the contract between American Charter and the WRAP holder, and not by the question of what entity serviced the loan. The fear that caused the sale that caused the damage was instilled by the refusal of American Charter to accept default cures, not by American Charter's insistence that it service the mortgages.

### 3.

The second illegal "tie" arose when American Charter offered to compromise the dispute between American Charter and the plaintiffs by allowing SPH to assume the first mortgage in exchange for SPH releasing all of the plaintiffs' claims, which would have also included a release of the right to cure defaults. This offer was made on or about August 13, 1991. By that time, the plaintiffs had made two cure tenders—one on July 18, 1991, and one on August 5, 1991. Between August 5, 1991, and August 13, 1991, the parties had also negotiated a "stand-still" agreement.

It is obvious that the second "tie" was not a direct cause of Rayman's fear that American Charter would foreclose. The second "tie" was no more than a reiteration of American Charter's position, expressed clearly, unequivocally (and wrongly) twice before, that it would not accept any attempt to cure the borrower's default.

Once again, if one assumes that everything happened as it did save for the second "tie," the result would have been precisely the same. That is to say, there would still have been a default, Rayman and SPH would still have tendered the cures, American Charter would still have refused the tenders, the plaintiffs would still have feared an American Charter foreclosure, and SPH would still have sold the Project.

It might be reasonable to suggest that the second "tie" slightly contributed to Rayman's fear of foreclosure because it confirmed American Charter's oft-stated position. I shall give the plaintiffs the benefit of that inference. But it is an unreasonable leap of logic to conclude that this second "tie" *directly or substantially* exacerbated the fear that caused the damage.[15]

After all, the attempted "tie" was never accepted or even responded to by Rayman and SPH. Moreover, and very importantly, the parties were then operating under an *agreed* "stand-still" agreement which preserved the status quo. By definition the status quo included American Charter's refusal to accept the tendered cures. The second "tie" obviously did nothing more than confirm what Rayman and SPH clearly already knew and feared, which was that American Charter was unwilling to accept the tendered cures and might foreclose.

In summary, the foreclosure fear that caused the sale that caused the damage was instilled by the refusal of American Charter to accept cure of the defaults, and the reason for that fear (refusal to accept the cures) existed in the same form before, during, and after the attempted tie. The second "tie" could not have been a direct cause of the damages.

### III.

 I agree that the transcript of the trial in this case was necessary within the meaning of 28 U.S.C. § 1920 in order to allow the plaintiffs to respond to the postjudgment motions. Accordingly, I shall

grant the plaintiffs' motion to allow as costs the fees for preparation of the trial transcript in the sum of $804.75.

Accordingly,

IT IS ORDERED that:

(1) The motion of defendant American Charter for judgment as a matter of law, or to alter or amend the judgment, or for new trial (Filing 162) is granted in part and denied in part in accordance with the foregoing memorandum;

(2) The motion for review of taxation of court costs (Filing 174) is granted, and additional costs in the amount of $804.75 are awarded in favor of Springfield Properties Holding, Inc.;

(3) A separate judgment shall be entered stating: "Pursuant to the prior rulings of this court and the jury's verdict, judgment as a matter of law is entered (a) for the defendant and against Springfield Properties Holding, Inc., on the anti-tying claims, providing that Springfield Properties Holding, Inc., shall take nothing on the anti-tying claims; (b) providing that the previous treble-damage and attorney-fee awards predicated on the anti-tying claims are set aside and that the previous judgment (Filing 161) is amended and altered accordingly; (c) for the defendant and against plaintiff Steven M. Rayman on the contract claims and the anti-tying claims, providing that Rayman shall take nothing on the contract claims and the anti-tying claims; and (d) for Springfield Properties Holding, Inc., and against American Charter Federal Savings & Loan Association, now known as Metropolitan Federal Bank, FSB, for damages in the sum of $726,180 on the contract claims, plus costs of suit, and postjudgment interest as provided by law."

---

**15.** Or, perhaps more graphically, while American Charter started the "forest fire" with its breach of contract and must be accountable therefor, the figurative act of "throwing a match into the fire," represented by the second "tie," ought not to be used as a justification for trebling the damages.