_____

No. 95-1086
No. 95-1088
_____

Steven M. Rayman; Springfield   *
Properties Holding, Inc.,   *
  *
    Plaintiffs - Appellees/   *  Appeals from the United States
    Cross-Appellant,   *  District Court for the
  *  District of Nebraska.
    v.   *
  *
American Charter Federal   *
Savings & Loan Association,   *
  *
    Defendant - Appellant/   *
    Cross-Appellee.   *

_____

Submitted:  September 11, 1995

Filed:  January 29, 1996
_____

Before WOLLMAN, LOKEN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.
_____

LOKEN, Circuit Judge.

In July 1991, American Charter Federal Savings & Loan Association ("American Charter") held the first mortgage on an apartment building in Springfield, Missouri (the "Property"). Steven M. Rayman held the junior, wraparound ("wrap") mortgage on that building. When American Charter refused Rayman's attempt to cure the borrower's default, Rayman foreclosed his wrap mortgage, sold the Property to a third party, paid off American Charter's first mortgage, and sued American Charter for breach of contract and illegal tying practices. American Charter now appeals the jury verdict awarding Rayman $726,180 in general and special damages for American Charter's breach of contract. Rayman cross-appeals the

district court's judgment denying treble damages and attorney's fees for the tying violations found by the jury. We reverse the judgment on the contract claim, concluding that the district court erred in construing the contract and in its damage instructions. We affirm the dismissal of Rayman's anti-tying claims.

## I. Background.

On September 26, 1985, Crest Mortgage Corporation, an entity then owned by Rayman, loaned $1,850,000 to the owners of the Property. The transaction consisted of two loans, a $1,000,000 loan secured by a first mortgage on the Property, and a $1,850,000 loan secured by a wrap mortgage on the Property.[1] The wrap mortgage required the borrower to make all principal and interest payments to the holder of the wrap mortgage, who in turn paid amounts owing to the holder of the first mortgage. In essence, the wrap mortgage represented a junior lien on $850,000 of the total $1,850,000 debt.[2]

The next day, Crest Mortgage sold the $1,000,000 first mortgage loan to American Charter, a savings and loan association in Lincoln, Nebraska, pursuant to a written Participation and Servicing Agreement (the "Participation Agreement"). The Participation Agreement provided that Crest Savings, a struggling financial institution also owned by Rayman, would "service" the

---

[1]Like the parties, we use the term "mortgage" for simplicity. Both mortgages consisted of deeds of trust, security agreements, and assignments of leases and rents.

[2]As in most wrap mortgage transactions, the wrap loan was made at a higher interest rate than the first mortgage loan, and the wrap lender received that higher rate on the total amount owing on both loans. See generally 3 Richard R. Powell & Patrick J. Rohan, Powell on Real Property ¶¶ 475.7 - 475.9 (3d ed. 1994).

Participation Loan by collecting amounts due under the first mortgage and remitting them to American Charter. At the same time but in a separate transaction, Crest Mortgage sold its interest in the wrap mortgage loan to Palm Beach FSB, another financial institution controlled by Rayman. Palm Beach later assigned its interest in the wrap mortgage loan to Rayman, with American Charter's consent.

In 1988, the borrower sought Chapter 11 bankruptcy protection. Crest Savings as servicer intervened in the bankruptcy and made sure that payments to American Charter on the first mortgage loan remained current. Apparently, American Charter was not even aware of the bankruptcy until the borrower petitioned for approval of a third amended plan of reorganization, which was approved by the bankruptcy court over American Charter's objection in mid-1989.

In May 1990, Crest Savings stopped servicing mortgages and proposed to American Charter that Rayman take over this function under the Participation Agreement. American Charter objected that Rayman was not an authorized substitute servicer under Paragraph 9 of the Participation Agreement:

> In the event . . . Crest [Savings] . . . ceases to service the Participation Loan, Crest [Savings] agrees that <u>servicing shall be transferred to either a subsidiary of [Crest Mortgage] or a financial institution insured by the FSLIC, or a wholly-owned subsidiary thereof.</u> The substituted servicing institution, unless such substituted servicer is a subsidiary of Crest [Savings] or [Crest Mortgage], shall be acceptable to both Crest [Savings] and [American Charter] and approved in writing by [American Charter].

(Emphasis added.) American Charter proposed to service the Participation Loan. Rayman informally agreed that American Charter would perform the servicing for a fee of one-eighth of a point.

In June 1991, the borrower stopped making payments on both mortgage loans. When Rayman learned of the default, he tendered payment of the amount past-due on American Charter's first mortgage loan and commenced to foreclose the wrap mortgage. On July 25, 1991, American Charter refused this tender and served the borrower with a notice of default, advising that the first mortgage loan would be accelerated. Rayman and American Charter then agreed that American Charter would not foreclose the first mortgage while Rayman proceeded to foreclose the wrap mortgage.

In August 1991, Rayman completed foreclosure, acquiring title to the Property in the name of a corporation formed for that purpose, plaintiff Springfield Properties Holding, Inc. ("SPH"). SPH then tendered to American Charter all amounts owing under the first mortgage loan. American Charter again refused the tender. Fearing that American Charter would now foreclose its first mortgage, SPH sold the Property in September 1991 for $1,750,000. It paid American Charter's first mortgage in full, keeping the balance of approximately $750,000.

SPH and Rayman then commenced this action against American Charter, seeking damages for breach of contract and for two alleged violations of the anti-tying provisions of the Home Owners' Loan Act of 1933 ("HOLA"), 12 U.S.C. § 1464(q). The jury returned a verdict in favor of SPH on all its claims for the full amount of contract damages sought, $726,180. The district court denied SPH treble damages and attorney's fees under HOLA on the ground that American Charter's violations were not the proximate cause of SPH's injury. However, the court upheld the jury's verdict on the breach of contract claims. See Rayman v. American Charter Fed. Sav. & Loan Ass'n, 866 F. Supp. 1252 (D. Neb. 1994). Both sides appeal.

## II. Breach of Contract Claims.

Rayman and SPH contend that the wrap mortgage holder had a right to cure the borrower's defaults and therefore American Charter breached the Participation Agreement when it rejected Rayman's pre-foreclosure tender of amounts owing under the first mortgage loan, and when it rejected SPH's post-foreclosure tender. In this rather unusual situation, these claims raise difficult issues regarding contract liability and damages.

### A. Did Rayman or SPH Have a Right To Cure?

In the district court's view, the wrap mortgage holder's right to cure, either before or after foreclosure of the wrap mortgage, is governed by the default provisions of the Participation Agreement. There are two relevant paragraphs:

> 11. <u>Default.</u> In the event of a default under a Participation Loan, Crest [Savings] shall promptly notify [American Charter] . . . and Crest [Savings], [American Charter] and any other participant in the Participation Loan shall promptly . . . attempt to reach an agreement as to the remedies or actions to be taken <u>subject to the rights of the Wrap Mortgage holder as defined hereinafter in paragraph 23.</u> If all of such participants cannot agree on a particular action to be taken within a reasonable time . . . then, if the participants owning not less than two-thirds (2/3) of the Participation Loan can agree on an action to be taken, which action shall be reasonable . . . such majority decision shall be controlling and [Crest Mortgage] [sic[3]] shall proceed in accordance therewith. In the event that agreement as set forth above cannot be reached, then Crest [Savings] shall proceed promptly to foreclose . . . . [A]fter acquisition of the Mortgaged Premises by means of foreclosure . . .

---

[3]Almost certainly, this should have been a reference to the servicer, Crest Savings. One of the problems in construing the Participation Agreement is that Rayman's drafters repeatedly confused the roles of Crest Mortgage and Crest Savings. The obvious inference is that they did a poor job of conforming a Rayman enterprise form to the facts of this transaction.

Crest [Savings] may, unless otherwise directed by a majority decision, manage, maintain or dispose of the Mortgaged Premises . . . . <u>If at any time Crest [Savings] does not agree with any majority decision, Crest [Savings] may purchase [American Charter's] interest in the Participation Loan for the then-current principal balance plus accrued yield to [American Charter].</u> Nothing contained herein shall limit [Crest Mortgage] [sic] from taking or refraining from taking any action it deems reasonably necessary in the exercise of its servicing obligations . . . .

\* \* \* \* \*

23. [American Charter] acknowledges the second lien position of Palm Beach Federal Savings Bank . . . an affiliate of Crest [Savings] and [Crest Mortgage], as the holder of a Wrap Mortgage . . . . <u>[American Charter] agrees that in the event of default, if Palm Beach or its affiliate takes title to the property through foreclosure . . . it shall not be an Event of Default under [American Charter's] first mortgage loan of $1,000,000, nor shall a subsequent sale . . . which is acceptable to [American Charter].</u> In that event [Crest Mortgage] [sic] shall continue to service [American Charter's] loan.

(Emphasis added.)  Focusing only on Paragraph 23, the district court held that the Participation Agreement was ambiguous on the question whether the wrap mortgage holder had a right to cure borrower defaults under the first mortgage.  The court allowed extrinsic evidence on this issue to determine the parties' intent, consisting of testimony outside the jury's presence by Rayman and American Charter's former employee who negotiated the Participation Agreement.  Relying on this testimony, the court instructed the jury that Paragraph 23 gave the wrap mortgage holder a right to cure both before and after foreclosure.[4]

Under Nebraska law, which governs the Participation Agreement, if the terms of a contract are not ambiguous, "the intent of the

_____

[4]On appeal, Rayman argues that we should affirm because SPH had a post-foreclosure right to cure under Missouri law of foreclosure.  However, we decline to consider a theory that the district court did not submit to the jury.

parties must be determined from the contents of the contract, and the contract must be enforced according to its terms." New Light Co. v. Wells Fargo Alarm Servs., 525 N.W.2d 25, 31 (Neb. 1994). Construing an unambiguous contract is a question of law for the court, and "[t]here is a strong presumption that a written instrument correctly expresses the intention of the parties to it." Artex, Inc. v. Omaha Edible Oils, Inc., 436 N.W.2d 146, 150 (Neb. 1989). However, if the contract is ambiguous -- that is, if it may objectively be understood in more than one sense -- then extrinsic evidence is admissible, and the parties' intent is a question of fact for the jury. See Luschen Bldg. Ass'n v. Fleming Cos., 415 N.W.2d 453, 458-59 (Neb. 1987); Lauritzen v. Davis, 335 N.W.2d 520, 527 (Neb. 1983).

The district court implied a right to cure from Paragraph 23 of the Participation Agreement. That provision unambiguously granted the wrap mortgage holder one specific right, to foreclose the wrap mortgage and to sell the Property without triggering an "Event of Default" under the first mortgage. Paragraph 23 says nothing about a right to cure, that is, a right of the wrap mortgage holder to prevent unwanted foreclosure by the first mortgage holder by keeping first mortgage loan payments current. Thus, American Charter argues, a right to cure may not be implied from the silence of Paragraph 23. "That constitutes a void but not an ambiguity." T.V. Transmission, Inc. v. City of Lincoln, 374 N.W.2d 49, 53 (Neb. 1985). See also Master Labs. v. Chesnut, 59 N.W.2d 571, 575 (Neb. 1953). If the contract documents and the situation were less complex, we would agree. In our view Paragraph 11 of the Participation Agreement does contain what the Supreme Court of Nebraska has called a "latent ambiguity." Younker Bros., Inc. v. Westroads, Inc., 241 N.W.2d 679, 684 (Neb. 1976). But this ambiguity is of no help to Rayman.

As Rayman testified, an essential feature of the wrap mortgage financing device is placing control of loan servicing in the hands

of the wrap mortgage holder.  That reduces loan costs for the senior lender, and it gives the junior lender control over the process, so that it can act quickly to protect its less secure investment.  Beyond control over servicing, the wrap mortgage lender may obtain two more safeguards *if the first mortgage holder agrees* -- first, the right to prepay the first mortgage loan, and second, the right, but not the obligation, to cure any borrower defaults under the first mortgage loan.  These safeguards permit the wrap mortgage holder to protect its position against first mortgage foreclosure by increasing its stake in the distressed loan.  However, there are corresponding disadvantages for the senior lienholder -- the right to prepay may prevent the senior lender from staying in a desirable, well secured loan, whereas the right to cure allows the wrap mortgage holder to hold the senior lender in place on a loan that it would prefer to accelerate and foreclose.  See 3 Powell & Rohan ¶¶ 475.9, 475.12.

The Participation Agreement in this case was drafted by the Rayman interests and reflects these tensions.  A Rayman entity, Crest Savings, was made the servicer.  Paragraph 9 allowed Rayman to transfer that function to a Crest Savings affiliate without American Charter's consent.  Paragraph 11, the comprehensive default provision, required attempted cooperation by participating lenders and gave a dominant remedial role to the servicer, including the absolute right to prepay the first mortgage loan. Although Paragraph 11, like Paragraph 23, was silent on the right to cure, Crest Savings in fact cured earlier defaults during the borrower's bankruptcy.  Thus, it is fair to infer *the servicer's* right to cure from the structure and language of Paragraphs 9 and 11, from the parties' prior conduct, and from the trial testimony of the Participation Agreement negotiators.[5]  In our view,

---

[5]We would expect a benefit as important as the right to cure to be explicitly granted in wrap mortgage documents drafted by the junior lender, so it is a close question whether the Participation Agreement should be construed as unambiguously

Paragraph 23 is virtually irrelevant to all this; its limited function was to answer one important question in the event the wrap mortgage should be foreclosed during a period in which the servicer was curing the borrower's failure to make first mortgage loan payments.

The complexity here arose because Rayman allowed the servicing function to be taken over by the first mortgage holder, American Charter.[6] This inverted the lenders' normal roles in a wrap mortgage transaction. There was no written agreement reflecting this role reversal because Rayman refused to sign a written servicing agreement drafted by American Charter. In these circumstances, the question is whether the right to cure first mortgage loan defaults and the right to prepay the first mortgage loan -- rights given to the servicer in the Participation Agreement -- remained with the servicer entity or were transferred to Rayman when the now-unfriendly lenders agreed to transfer the servicing function to American Charter in June 1990. Thus, in deciding the right to cure issue, both plaintiffs and the district court focused on the wrong agreement. Plaintiffs only claimed a right to cure arising from the Participation Agreement, an agreement which granted that right to the servicer. Plaintiffs did not claim that American Charter agreed to transfer the right to cure to the wrap mortgage holder when American Charter assumed the role of servicer,

---

contrary to Rayman's contention. See Artex, 436 N.W.2d at 150-51. On the other hand, the complex default provisions in Paragraph 11 do not seem workable unless they include the servicer's right to cure defaults while the lenders decide how to deal with a troubled borrower. Thus, we are satisfied that the contract is ambiguous in this regard and that the evidence establishes the servicer's implied right to cure.

[6]Rayman may have lost effective control over the servicing function before Crest Savings withdrew as servicer, when he sold his interest in Crest Savings without renegotiating the successor-servicer provisions of Paragraph 9 of the Participation Agreement. But if so, that misstep was not American Charter's fault.

with Rayman's consent. Thus, it is apparent that neither Rayman nor SPH had the claimed right to cure, and American Charter is entitled to judgment as a matter of law dismissing their contract claims.

## B. Damages for Breach of Contract.

Even if plaintiffs could recover from American Charter on their contract claims, we would reverse the district court's judgment in their favor because of two damage instruction errors.

1. Rayman's contract damage theory is that American Charter's breach of the right to cure forced SPH to sell the Property for $188,000 less than its fair market value, causing SPH to lose an additional $359,180 in future income and $179,000 in future appreciation. The jury awarded the entire amount requested, $726,180, and the district court upheld this award. American Charter argues that the court should have applied the principle that damages for breach of a contract to lend money are limited to the cost of substitute financing, absent proof of special damages. We agree.

The district court rejected this contention because "Rayman and SPH were creditors just like American Charter." That ignores Rayman's trial testimony:

> Q [The Participation Agreement] says that [the wrap mortgage holder] has to maintain the 10% ownership interest in the wrap at all times. Is that true?
>
> A That's what it says, yes.
>
> Q And when the wrap disappears [through foreclosure], can that provision be complied with?

* * * * *

-10-

    A  Well . . . [w]e wouldn't have the mortgage.  We would
    be the owner.

    Q  The first mortgage is still there, isn't it?

    A  You bet.  <u>We would be your borrower.</u>

(Emphasis added.)  That testimony simply reflects economic reality.
Once Rayman through SPH bought the Property in foreclosure, SPH
owed American Charter $1,000,000.  American Charter wanted out of
the credit, so it rejected SPH's attempt to cure and accelerated
the first mortgage loan.  If that action breached the contract,
Rayman could maintain SPH's investment by either investing or
borrowing an additional $1,000,000 to repay American Charter.  It
is undisputed that Rayman had the financial ability to do that.
Therefore, SPH's injury is simple to measure -- the fair market
cost of alternative financing.  Given Rayman's financial strength
and experience in such transactions, American Charter had no reason
to foresee that any special damages would be incurred.  Therefore,
Nebraska law limits SPH's damages to the difference between the
contract interest rate and the increased interest rate and costs of
obtaining alternative financing.  <u>Rubin v. Pioneer Fed. Sav. & Loan
Ass'n</u>, 334 N.W.2d 424, 428 (Neb. 1983); <u>Shurtleff v. Occidental
Bldg. & Loan Ass'n</u>, 181 N.W. 374, 375 (Neb. 1921).  The district
court erred in failing to instruct the jury accordingly.

    2. The district court also erred by allowing the jury to award
not only the difference between the Property's fair market value
and SPH's sale price, but also lost future profit and appreciation.
Fair market value of an income-producing property "by definition
reflect[s] a market estimation of future profits . . . ."
<u>Whitehead Oil Co. v. City of Lincoln</u>, 515 N.W.2d 401, 411 (Neb.
1994), <u>quoting</u> <u>Wheeler v. City of Pleasant Grove</u>, 833 F.2d 267, 271
(11th Cir. 1987).  Therefore, if SPH had a right to special damages
for forced sale, those special damages would be limited to
$188,000.

-11-

# III. The Tying Claims.

In 1982, Congress amended HOLA by enacting anti-tying and antireciprocity restrictions previously imposed on commercial banks under the Bank Holding Company Act. See Integon Life Ins. Corp. v. Browning, 989 F.2d 1143, 1149 (11th Cir. 1993). Those provisions as amended provide in relevant part:

**12 U.S.C. § 1464(q) - Tying Arrangements**

(1) A savings association may not in any manner extend credit, lease, or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement--

    (A) that the customer shall obtain additional credit, property, or service from such savings association, or from any service corporation or affiliate of such association, other than a loan, discount, deposit, or trust service;

    (B) that the customer provide additional credit, property, or service to such association, or to any service corporation or affiliate of such association, other than those related to and usually provided in connection with a similar loan, discount, deposit or trust service . . . .

The statute provides a treble damage remedy. See 12 U.S.C. § 1464(q)(3). These are antitrust restraints specific to the field of commercial banking and therefore must be applied in a manner consistent with Sherman Act and Clayton Act principles. See Davis v. First Nat'l Bank of Westville, 868 F.2d 206, 208 (7th Cir.), cert. denied, 493 U.S. 816 (1989). We construe the anti-tying restraints as requiring proof that a challenged banking practice "was unusual in the banking industry; resulted in an anti-competitive tying arrangement; and benefitted the bank." Alpine Elec. Co. v. Union Bank, 979 F.2d 133, 135 (8th Cir. 1992).

-12-

In this case, Rayman alleges two anticompetitive tying practices. First, he contends that American Charter violated § 1464(q)(1)(A) when it demanded that Rayman allow American Charter to service the Participation Loan for a fee after Crest Savings withdrew from its role as servicer. This contention is without merit for many reasons. (1) The challenged practice is a "loan service" expressly excluded from subsection (1)(A). (2) The challenged practice did not link "two separate product markets," as required by <u>Jefferson Parish Hosp. Dist. No. 2 v. Hyde</u>, 466 U.S. 2, 21 (1984). American Charter purchased one product, a participation loan; who serviced that loan was a term of the transaction, not a separate product. <u>Cf.</u> <u>Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago</u>, 877 F.2d 1333, 1338 (7th Cir. 1989) (no separate market for the "lock box" used in an asset-backed loan). (3) Because Rayman had voluntarily relinquished an absolute right to transfer servicing to an entity he controlled, his decision to accept American Charter as servicer was not the product of the coercion necessary to prove an unlawful tying arrangement. (4) Rayman's assault on the fee "extracted" by American Charter for servicing the Participation Loan is unpersuasive. The initial agreement provided that Crest Savings would service the first mortgage loan at no charge to American Charter; obviously, American Charter would expect to be paid a fee for taking over an obligation that the wrap mortgage holder customarily performs.

Second, Rayman alleges that American Charter violated § 1464(q)(1)(B) after foreclosure of the wrap mortgage, when it offered to let SPH assume the first mortgage in exchange for Rayman releasing all of his claims against American Charter. This theory, too, is without merit. American Charter's proposal to resolve a troubled loan did not link two separate product markets. Nor was there the requisite coercion. Rayman's admitted financial strength gave him many options: insist on SPH's right to cure, litigating foreclosure by American Charter if necessary; insist that Paragraph 11 of the Participation Agreement gave him an absolute right to

-13-

prepay the first mortgage, without a release; and, if all else failed, yield to American Charter's desire to be out of the credit by refinancing the first mortgage through another lender and then sue American Charter to recover those costs. Finally, there is no credible evidence that this proposal was "unusual in the banking industry."[7] To the contrary, a prudent bank can be expected to want a release when it resolves a complex dispute of this nature.

To recover treble damages under § 1464(q), plaintiff's injury must be a direct consequence of the illegal tie. See Sundance Land Corp. v. Community First Fed. Sav. & Loan Ass'n, 840 F.2d 653, 660 (9th Cir. 1988); Campbell v. Wells Fargo Bank, 781 F.2d 440, 443 (5th Cir.), cert. denied, 476 U.S. 1159 (1986). The district court held that neither anti-tying violation was the proximate cause of Rayman's damages. Rayman, 866 F. Supp. at 1265-66. We agree. But in addition, we conclude that it was reversible error to admit "expert" testimony that American Charter's actions were anticompetitive and then to submit the anti-tying claims to the jury, thereby suggesting that American Charter may have been guilty of a federal statutory tort. This was a legitimate breach-of-contract case but an illegitimate antitrust case.

We reverse the judgment of the district court on plaintiffs' breach of contract claims, affirm the dismissal of plaintiffs' claims under 12 U.S.C. § 1464(q), and remand with instructions to enter judgment in favor of American Charter.

A true copy.

Attest:

---

[7]There was no foundation for the so-called expert opinions offered at the trial by a Maryland banking consultant. We reject those opinions as neither credible nor rational.

-14-

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.